**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MICHIGAN**

**SOUTHERN DIVISION**

**KHALID ALI,**

   **Plaintiff,**

**v.**                               **Case No. 2:25-cv-10815-SKD-APP**

                                 **Hon. Susan K. DeClercq**

                                 **Mag. Judge Anthony P. Patti**

**IT PEOPLE CORPORATION, INC.**

**and MERCALIS, INC. (also known as Valeris Health, Inc.),**

   **Defendants.**

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

## I. Introduction

**1.**   This is an employment discrimination and retaliation case arising under the Americans with Disabilities Act (ADA), Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and Michigan's Bullard-Plawecki Employee Right to Know Act.

**2.**   Plaintiff alleges that Defendants, as joint employers, engaged in disability interference and retaliation, race discrimination and retaliation, unlawful withholding of personnel records, and related adverse employment actions.

---

## II. Jurisdiction and Venue

**3.**   This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under federal law.

**4.**   Supplemental jurisdiction exists under 28 U.S.C. § 1367 for Plaintiff's related state-law claims.

**5.**   Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims occurred in this District.

---

## III. Parties

**6.**   Plaintiff Khalid Ali is a resident of Detroit, Michigan.

**7.**   Defendant IT People Corporation is a North Carolina corporation doing business in Michigan, with offices in this District.

**8**.   Defendant Mercalis, Inc. (Valeris Health) is a North Carolina corporation doing business in Michigan, with employees and operations in this District.

**9**.   At all relevant times, Defendants were Plaintiff's joint employers, sharing control over his work, pay, benefits, and termination.

---

## IV. Factual Allegations

## FACTUAL ALLEGATIONS

**10.** Plaintiff Khalid Ali is Black/African American.

**11.** In 2022, Plaintiff began working on the Mercalis QA team through IT People Corporation, which acted as his staffing employer.

**12.** IT People was responsible for payroll, HR documentation, and employment support.

**13.** Mercalis exercised daily supervision and control over Plaintiff's assignments, performance, and access to necessary systems.

14. Plaintiff was the only Black member of the QA team during the relevant period.

15. In June and July 2024, Plaintiff and several coworkers raised concerns about hostile conduct by QA Manager Vicky Thai to Mercalis Human Resources.

16. Plaintiff also met separately with a Mercalis HR representative and personally described Ms. Thai's hostile conduct.

17. This meeting placed Mercalis on direct notice of Plaintiff's protected activity.

18. Shortly after these complaints, Mercalis reassigned supervisory authority from Vicky Thai to Cain Hevia.

19. Under Mr. Hevia, Plaintiff experienced increased oversight, burdensome approval requirements, and heightened scrutiny of his work.

20. On August 13, 2024, Plaintiff attempted to begin his workday but was abruptly locked out of Mercalis's Azure DevOps system.

21. Plaintiff promptly contacted Mr. Hevia, who responded that he did not know why Plaintiff lacked access.

22. Plaintiff also contacted Ms. Thai, who did not respond, and Mercalis IT, which did not resolve the issue.

**22 a.** On August 13, 2024, Plaintiff's coworker Omer K confirmed via WhatsApp that Plaintiff's lockout appeared retaliatory, stating "Because you guys reached out to HR about her," referring to Plaintiff's prior HR complaints against QA Manager Vicky Thai (see Exhibit F1).

23. Plaintiff remained logged in through Webex and available for duty while waiting for assistance.

24. Later that morning, Plaintiff called IT People Workforce Solutions Director Cara Barkley for clarification.

25. Ms. Barkley initially stated she did not know why Plaintiff was locked out.

26. Approximately thirty minutes later, Ms. Barkley called Plaintiff back and stated that "Mercalis ended the contract."

**26 A.** That afternoon, Mercalis QA Manager Vicky Thai sent a Webex message to the QA team announcing that Plaintiff had been removed from the project. This message was issued to coworkers rather than to Plaintiff directly. At the time, Plaintiff had still not received any written notice or formal explanation regarding his termination. (See Exhibit H).

27. Neither IT People nor Mercalis provided written termination paperwork.

28. Plaintiff was not compensated for approximately four hours of work performed and time spent logged in on August 13, 2024.

29. After his termination, Plaintiff submitted multiple requests to IT People for completion of a DHS-38 disability verification form required to maintain Medicaid coverage and proceed with transplant evaluation.

30. On August 19, 2024, Plaintiff emailed IT People HR Director Apoorva Ahuja the DHS-38 form.

31. Ms. Ahuja acknowledged receipt but did not complete or return the form.

32. Plaintiff resent the form in PDF format, but IT People still failed to complete it.

33. On October 24, 2024, Ms. Barkley emailed Plaintiff and mischaracterized the DHS-38 as paperwork "for Unemployment Insurance Benefits" and attempted to deflect responsibility to Mercalis (Exhibit B).

34. On January 13, 2025, Plaintiff again clarified in writing that the DHS-38 was not unemployment paperwork, stating: "I need this filled out and sent back as soon as possible" (Exhibit C).

35. IT People never completed or returned the DHS-38.

36. Plaintiff also requested employment verification from IT People in September 2024 and January 2025 (Exhibit H).

37. Ms. Barkley asked if one request "was for unemployment," and the requests were not fulfilled.

38. Plaintiff requested a sick-time payout from IT People, but no payment was made.

39. Plaintiff also requested personnel records and equipment-return instructions from Mercalis.

40. On June 9, 2025, Plaintiff submitted a written request to Mercalis HR for his complete personnel file, copying supervisors Cain Hevia and Vicky Thai.

41. On June 19, 2025, Mercalis HR Manager Kristin Moore responded in writing that "no personnel file exists" for Plaintiff and asserted that Mercalis had no obligation to maintain one (Exhibit G). However, Plaintiff recalls reviewing documents during a meeting with QA Manager Vicky Thai following a performance evaluation that he reasonably believes constituted part of his personnel file. This contradiction raises a factual dispute as to whether Mercalis withheld or destroyed employment records it was obligated to maintain.

42. Mercalis did not provide personnel records, payroll documentation, or equipment-return labels in response to Plaintiff's written request.

43. Plaintiff's non-Black coworkers, by contrast, received laptop return labels, sick-time payouts, and employment verification documents during the same period (Exhibit F).

44. The failure to provide Plaintiff with these records and payments prevented him from verifying his hours worked, benefits owed, and the circumstances of his termination, causing financial harm and obstructing his ability to pursue legal and administrative remedies

45. The failure to complete the DHS-38 for more than 240 days disrupted Plaintiff's Medicaid coverage and delayed his kidney transplant evaluation (Exhibits D, E).

46. Plaintiff was forced to remain on dialysis during this delay, which increased his medical risks and caused further harm.

47. Plaintiff's treating physician, Dr. Faber, confirmed that the DHS-38 obstruction directly delayed transplant eligibility (Exhibit D).

48. Corewell Health also issued a letter confirming that transplant evaluation remained frozen pending Medicaid and insurance documentation (Exhibit E).

49. As a result of these delays, Plaintiff experienced worsened health risks, financial hardship from substitute insurance costs, and additional transportation and treatment burdens.

50. Plaintiff also experienced emotional distress, including stress, anxiety, depression, and insomnia.

51. Plaintiff underwent counseling, was treated by a psychiatrist, and was prescribed psychiatric medication including Lexapro (Exhibit J).

52. Defendants' actions—including denial of records, nonpayment of wages, failure to process disability documentation, and obstruction of employment verification—were willful, malicious, and undertaken with knowledge of Plaintiff's race and disability.

---

**V. Causes of Action**

**COUNT I — ADA INTERFERENCE**

**42 U.S.C. § 12203(b)**

**(Against IT People Corporation and Mercalis, Inc.)**

53. Plaintiff incorporates Paragraphs 1–53 by reference.

54. The ADA makes it unlawful to coerce, intimidate, threaten, or otherwise interfere with any individual in the exercise or enjoyment of rights protected by the Act.

55. On August 19, 2024, Plaintiff submitted a DHS-38 disability verification form to IT People HR Director Apoorva Ahuja. Despite repeated follow-ups, IT People failed to complete and return the form for over 240 days. (See Exhibits A–C).

56. Mercalis was placed on notice through HR Manager Kristin Moore and Chief Strategy Officer Scott Dulitz of Plaintiff's medical condition and the need for timely documentation. Mercalis did not provide supporting documentation or intervene. (See Exhibit G).

57. Defendants' refusal to process or assist with the DHS-38 interfered with Plaintiff's ADA rights by obstructing his ability to maintain Medicaid coverage and proceed with transplant evaluation.

58. As a direct result, Plaintiff's Medicaid continuity was disrupted, transplant eligibility delayed, dialysis prolonged, and his emotional and financial harm increased.

**Relief Requested for Count I**

59. Plaintiff seeks judgment against IT People and Mercalis, jointly and severally,

awarding:

**a**. Back pay and economic damages tied to delays in benefits and treatment;

**b**. Compensatory damages for medical harm and emotional distress;

**c**. Punitive damages where permitted by law;

**d**. Equitable and injunctive relief, including directives to comply with ADA documentation duties;

**e**. Reasonable attorney's fees and costs; and

**f**. Such other and further relief as the Court deems just and proper.

---

## COUNT II — ADA RETALIATION

## 42 U.S.C. § 12203(a)

## (Against IT People Corporation and Mercalis, Inc.)

60. Plaintiff incorporates Paragraphs 1–60 by reference.

61. The ADA prohibits discrimination against an individual because such individual opposed ADA violations or requested accommodation.

62. In June–July 2024, Plaintiff engaged in protected activity by reporting hostile workplace conduct to Mercalis HR.

63. Beginning August 19, 2024, Plaintiff engaged in further protected activity by requesting ADA-related documentation (DHS-38) from IT People.

64. On August 13, 2024, Mercalis, acting through Cain Hevia and Vicky Thai, disabled Plaintiff's Azure DevOps access without explanation. Despite contacting supervisors and IT, access was not restored.

    64 a. Plaintiff's coworker, Omer K, confirmed via WhatsApp that the August 13, 2024 lockout was retaliatory, stating that it occurred "because you guys reached out to HR about her," referring to Plaintiff's protected complaints regarding QA Manager Vicky Thai. This contemporaneous statement corroborates that Plaintiff's exclusion from system access was linked to his protected activity (see Exhibit F ).

65. That same morning, IT People Workforce Solutions Director Cara Barkley first stated she did not know the reason for the lockout, then later told Plaintiff, "Mercalis ended the contract." No written termination notice was issued.

    65 a. That same afternoon, at approximately 2:56 p.m., Mercalis QA Manager Vicky Thai sent a Webex message to the QA team—not to Plaintiff—announcing that "as of today Khalid is no longer with our team" and instructing coworkers to reassign tasks and bugs away from him. This

internal announcement, made without providing Plaintiff any written or

direct notice, demonstrates that Defendants coordinated Plaintiff's

termination behind the scenes while concealing it from him personally (see

Exhibit H)

66. On August 13, 2024, Defendants failed to fully compensate Plaintiff for

approximately four hours of work during which he was present and available

to perform his duties.

67. Following termination, IT People failed to provide verification of

employment or process the DHS-38; Mercalis denied the existence of a

personnel file.

68. The temporal proximity between Plaintiff's protected activity and the

adverse actions, combined with Defendants' shifting explanations, supports

an inference of retaliatory intent.

69. As a direct and proximate result, Plaintiff suffered economic losses, delayed

medical progression, emotional distress, insomnia, and financial harm.

**Relief Requested for Count II**

**70**. Plaintiff seeks judgment against IT People and Mercalis, jointly and severally,

awarding:

**a**. Back pay for unpaid hours on August 13, 2024;

**b**. Compensatory damages for emotional and medical harm;

**c**. Punitive damages where permitted by law;

**d**. Equitable relief including orders prohibiting retaliation;

**e**. Reasonable attorney's fees and costs; and

**f**. Such other and further relief as the Court deems just and proper.

---

## COUNT III — Title VII Retaliation

## 42 U.S.C. § 2000e-3(a)

## (Against IT People Corporation and Mercalis, Inc.)

71. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

72. Title VII makes it unlawful for an employer to retaliate against an employee because the employee opposed practices made unlawful by Title VII or participated in protected activity.

### Protected Activity and Notice

73. In mid-2024, after internal team discussions, Plaintiff met privately with a Mercalis HR representative and reported hostile conduct by QA Manager Vicky Thai, placing HR on direct notice of his protected activity.

74. Plaintiff reasonably believed that Ms. Thai's conduct created a discriminatory

and retaliatory environment; his complaints to HR were protected activity under Title VII.

**Adverse Actions by Defendants**

**75.** Shortly thereafter, Mercalis reassigned supervisory authority from Ms. Thai to Cain Hevia, who escalated scrutiny of Plaintiff, imposed heightened approvals, required granular task reporting, and enforced harsher conditions not applied to similarly situated non-Black coworkers (other QA Analysts not identifying as Black).

**76**. On August 13, 2024, Mercalis—acting through Hevia and Thai—disabled Plaintiff's access to required systems. Despite Plaintiff contacting supervisors and Mercalis IT, access was not restored.

**77**. That same morning, Plaintiff called IT People Workforce Solutions Director Cara Barkley seeking clarification. Ms. Barkley first stated she did not know why access was blocked; approximately thirty minutes later, she stated that "Mercalis ended the contract." Neither Defendant issued written termination paperwork or provided a legitimate explanation.

**78**. After the end of the assignment, IT People (through Ms. Barkley and HR Director Apoorva Ahuja) did not provide requested employment verification, did not timely address Plaintiff's requests regarding the DHS-38, and did not provide a sick-time accounting or payout.

**79**. Mercalis HR (through Kristin Moore) stated that no personnel file existed and did not provide equipment-return labels or other routine off-boarding **assistance** that non-Black coworkers received.

**80**. Defendants also failed to fully compensate Plaintiff for approximately four hours on August 13, 2024, when he was present and available to work; those unpaid hours are sought as compensatory damages flowing from Defendants' retaliatory actions (see Exhibit I).

**Causal Connection and Material Adversity**

**81**. The system lockout, shifting explanations for ending the assignment, constructive termination without notice, nonpayment of time on August 13, 2024, and obstruction of post-termination requests are materially adverse actions that would dissuade a reasonable employee from engaging in protected activity.

**82**. The close temporal proximity between Plaintiff's HR complaint and Defendants' adverse actions, together with the sequence of events and stated reasons, supports a causal connection.

**Relief Requested for Count III**

**83**. As a direct and proximate result of Defendants' retaliation, Plaintiff suffered lost wages, delays in medical progression and transplant eligibility, emotional distress (including insomnia), and financial hardship (see Exhibits D, E, J).

**84**. Plaintiff seeks judgment against IT People and Mercalis, jointly and severally,

awarding:

**a**. Compensatory damages, including back pay and emotional distress;

**b**. Punitive damages where permitted by law;

**c**. Equitable and injunctive relief as appropriate, including non-retaliation directives and compliance monitoring;

**d**. Reasonable attorney's fees and costs; and

**e**. Such other and further relief as the Court deems just and proper.

---

## COUNT IV — Title VII Race Discrimination

## 42 U.S.C. § 2000e-2(a)

## (Against IT People Corporation and Mercalis, Inc.)

85. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

86. Title VII makes it unlawful for an employer to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race.

87. Plaintiff is Black/African American and, during the relevant period, was the only Black member of the Mercalis QA team.

88. IT People and Mercalis were Plaintiff's joint employers: Mercalis exercised day-to-day supervisory control over work assignments, oversight, and

system access, while IT People handled payroll, HR documentation, and personnel support. Each shared responsibility for the terms and conditions of Plaintiff's employment.

89. After Plaintiff and coworkers raised concerns to Mercalis HR, Mercalis reassigned supervisory authority from Vicky Thai to Cain Hevia. Under Hevia's supervision, Plaintiff was subjected to increased monitoring, heightened approvals, and conditions more burdensome than those applied to similarly situated non-Black coworkers (other QA Analysts not identifying as Black).

90. On August 13, 2024, Plaintiff was locked out of Azure DevOps. Plaintiff's messages to Hevia and Thai went unanswered, while non-Black coworkers experiencing comparable technical issues received prompt assistance and restoration of access.

90 a. On August 13, 2024, Plaintiff exchanged WhatsApp messages with coworker Omer K, who stated that it was "not professional" for Plaintiff to be locked out without notice and further explained that it occurred "because you guys reached out to HR about [Vicky]." This statement confirms that Plaintiff's system access was disabled in direct retaliation for raising

concerns to Mercalis HR regarding Ms. Thai's hostile conduct. (See Exhibit F).

91. That same morning, Plaintiff contacted IT People Workforce Solutions Director Cara Barkley. She first stated she did not know the reason for the lockout; approximately thirty minutes later she stated that "Mercalis ended the contract." IT People repeated and adopted Mercalis's explanation without independent review or standard off-boarding procedures.

92. Following the end of the assignment, Plaintiff's requests for employment documentation, sick-time payout, and return labels for company equipment were not timely addressed, whereas non-Black coworkers received these items without delay.

93. Plaintiff was not fully compensated for approximately four hours on August 13, 2024, when he was present and available to work. Non-Black coworkers did not experience similar nonpayment in comparable circumstances (see Exhibit I).

94. Mercalis HR stated in writing that no personnel file existed for Plaintiff, and IT People did not provide personnel-related documentation or correct the payroll discrepancy, while non-Black employees received routine support for such requests (see Exhibit G).

**95.** These facts plausibly show that Plaintiff was treated less favorably than similarly situated non-Black employees by both Defendants, and that race was a motivating factor in the adverse actions and denials of routine support.

**Relief Requested for Count IV**

**96.** As a direct and proximate result of Defendants' race discrimination, Plaintiff suffered lost wages (including the unpaid time on August 13, 2024), denial of benefits and routine support, emotional distress (including insomnia), reputational harm, and financial hardship (see Exhibits D, E, J).

**97.** Plaintiff seeks judgment against IT People and Mercalis, jointly and severally, awarding:

**a**. Compensatory damages, including back pay and emotional distress;

**b**. Punitive damages where permitted by law;

**c**. Equitable and injunctive relief as appropriate, including non-discrimination directives and compliance monitoring;

**d**. Reasonable attorney's fees and costs; and

**e**. Such other and further relief as the Court deems just and proper.

**COUNT V — Bullard-Plawecki Employee Right to Know Act**

**(Against IT People Corporation and Mercalis, Inc.)**

98. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

99. The Bullard-Plawecki Employee Right to Know Act requires employers doing business in Michigan to maintain a personnel record for each employee and, upon written request, provide the employee an opportunity to review that record within thirty (30) days.

**Request to IT People**

100. On or about August 19, 2024, Plaintiff submitted a written request to IT People for personnel information including his personnel file, payroll documentation, and related HR records. IT People did not provide access within 30 days and eventually produced incomplete materials, omitting HR communications, termination/off-boarding documents, and payroll records.

**Request to Mercalis**

101. On June 9, 2025, Plaintiff submitted a written request to Mercalis for his complete personnel record, directed to HR and copying supervisors Cain Hevia and Vicky Thai. The request identified categories such as performance evaluations, complaints, disciplinary notices, payroll records, equipment-return information, and termination notes.

102. On June 19, 2025, Mercalis HR Manager Kristin Moore responded in writing that "no personnel file exists" for Plaintiff and asserted that Mercalis had no obligation to maintain one (see Exhibit G).

103. Plaintiff recalls reviewing documents he believes constituted part of his personnel file during a prior meeting with supervisor Vicky Thai, following a performance evaluation. This contradicts Mercalis's claim that no such file exists.

**Harm and Consequences**

104. By failing to provide complete personnel records, IT People violated Plaintiff's rights under the Act.

105. By denying the existence of a personnel file and refusing to produce responsive materials, Mercalis violated Plaintiff's rights under the Act.

106. Defendants' failures impaired Plaintiff's ability to verify wages, hours, benefits, and separation details, and deprived him of access to routine employment records such as payroll documentation and equipment-return instructions for the Mercalis-issued laptop. These failures caused consequential harm including time, expense, and delay in securing routine records.

**Relief Requested for Count V**

**107.** Plaintiff seeks judgment against IT People and Mercalis, jointly and severally, awarding:

**a.** Actual damages proximately caused by Defendants' violations;

**b**. Injunctive relief compelling production of all personnel records and related materials;

**c**. Reasonable attorney's fees and costs; and

**d**. Such other and further relief as the Court deems just and proper.

---

**COUNT VI — 42 U.S.C. § 1981**

**Race Discrimination and Retaliation**

**(Against Defendant Mercalis, Inc.)**

108. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

109. Section 1981 guarantees all persons the same right to make and enforce contracts as is enjoyed by white citizens, including the making, performance, modification, and termination of contracts, and the

enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

110. Plaintiff is Black/African American and, during the relevant period, was the only Black member of the Mercalis QA team.

111. Plaintiff entered into an employment relationship through IT People to perform services on the Mercalis QA team. Mercalis exercised daily supervisory authority over Plaintiff's assignments, system access, and performance, thereby holding contractual authority over the terms and conditions of Plaintiff's work.

112. After Plaintiff raised concerns about hostile management to Mercalis HR in 2024, Mercalis supervisors Cain Hevia and Vicky Thai subjected Plaintiff to disparate treatment compared to similarly situated non-Black coworkers.

112 a. Omer K, a QA coworker told Plaintiff via WhatsApp that Plaintiff's system issues and subsequent lockout occurred "because you guys reached out to HR about [Vicky]," directly linking management's actions to Plaintiff's protected complaints about hostile conduct. This contemporaneous statement corroborates that Plaintiff's adverse treatment was retaliatory in nature (see Exhibit F1).

113. On August 13, 2024, Mercalis supervisors Cain Hevia and Vicky Thai disabled Plaintiff's Azure DevOps access and did not respond to his messages requesting assistance. Non-Black coworkers who experienced comparable technical issues received prompt support and restoration of access. That same morning, IT People's Workforce Solutions Director Cara Barkley initially denied knowledge of the lockout but later stated that "Mercalis ended the contract." No written termination notice was ever provided.

114. On August 13, 2024, later that afternoon, QA Manager Vicky Thai sent a Webex message to the QA team stating that Plaintiff "is no longer with our team" and instructing coworkers to redirect tasks and bugs away from him. This message was sent to coworkers, not Plaintiff, further evidencing that Plaintiff was constructively terminated without notice and treated differently than non-Black employees whose terminations were processed with standard off-boarding support (see Exhibit H).

115. Following termination, Plaintiff's requests for employment documentation, sick-time payout, and final wage accounting were ignored. Non-Black coworkers, however, received timely documentation, payouts, and equipment-return instructions.

116. Plaintiff was denied pay for approximately four hours of compensable work on August 13, 2024, despite being logged in and available to perform his duties. Non-Black coworkers did not suffer comparable wage denial.

117. WhatsApp messages among QA coworkers confirm that non-Black employees received return labels, sick-time payouts, and employment verification, while Plaintiff was denied the same resources (see Exhibit F).

118. Mercalis HR Manager Kristin Moore further stated in writing that "no personnel file exists" for Plaintiff (see Exhibit G), depriving him of the ability to verify payroll records, termination documentation, and HR complaints, while non-Black employees had access to such records.

119. This selective withholding of resources and concealment of records constitutes disparate treatment based on race and supports an inference of spoliation of employment documentation.

120. Mercalis also retaliated against Plaintiff for engaging in protected activity, including raising HR complaints and requesting documentation related to his employment and disability.

121. As a direct and proximate result of Mercalis's race-based discrimination and retaliation, Plaintiff suffered lost wages (including unpaid work hours

and denial of sick-time payout), lost benefits, delay in medical treatment, emotional distress, reputational harm, and financial hardship.

**Relief Requested for Count VI**

**121**. Plaintiff seeks judgment against Mercalis, awarding:

**a**. Compensatory damages for lost wages, lost benefits, emotional distress, and medical harm;

**b**. Punitive damages for intentional race-based discrimination and retaliation;

**c**. An adverse inference instruction regarding missing HR and payroll records;

**d**. Reasonable attorney's fees and costs; and

**e**. Such other and further relief as the Court deems just and proper.

---

**VII. Damages**

**122.** As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer:

**a**. Economic Damages. Including lost wages; denial of sick-time payout; potential additional unpaid wages concealed by Defendants' failure to maintain and produce complete personnel and payroll records; increased job search difficulty and

reputational harm; out-of-pocket costs for substitute insurance coverage, including COBRA; and loss of benefits and professional opportunities.

**b**. Medical Damages. Including prolonged delay in transplant eligibility and continued dialysis treatment caused by Defendants' obstruction of the DHS-38 process, which froze Plaintiff's Medicaid coverage for more than 240 days; increased mortality risk associated with extended dialysis; and additional transportation and medical care costs incurred as a result of the delay.

**c**. Emotional and Psychological Damages. Including stress, anxiety, depression, insomnia, humiliation, and reputational harm, which required Plaintiff to undergo counseling with a therapist, treatment by a psychiatrist, and prescription of psychiatric medication (Lexapro).

**d**. Bullard-Plawecki Relief. Including actual damages and injunctive relief under the Bullard-Plawecki Employee Right to Know Act, MCL 423.501 et seq.

**e**. Punitive Damages. For Defendants' willful and retaliatory conduct in violation of the ADA, Title VII, and § 1981. The misconduct reached executive-level management, including Mercalis Chief Strategy Officer Scott Dulitz, who was placed on direct notice of Plaintiff's disability verification delay and HR preservation issues yet failed to take corrective action. This corporate-level disregard for Plaintiff's rights warrants punitive damages.

**123.** Defendants' conduct was willful, malicious, and in reckless disregard of Plaintiff's federally protected rights, justifying an award of punitive damages.

**124.** Plaintiff is entitled to recover attorneys' fees and costs under 42 U.S.C. §§ 1988, 2000e-5(k), 12205, and other applicable provisions.

**125.** Plaintiff is entitled to equitable and injunctive relief, including but not limited to:

**a**. An order compelling Defendants to produce all personnel, payroll, and HR complaint records;

**b**. An adverse inference instruction regarding missing or obstructed records, including the DHS-38 disability verification and payroll/leave documentation;

**c**. Declaratory relief confirming that Defendants' conduct violated Plaintiff's rights under the ADA, Title VII, § 1981, and Michigan law.

---

## VIII. Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants IT People Corporation and Mercalis, Inc., jointly and severally where applicable, and award the following relief:

126. Back pay and compensatory damages for lost wages, benefits, and ongoing economic harm;

127. Medical and emotional distress damages, including for delayed transplant eligibility and psychiatric harm;

128. Punitive damages for Defendants' willful and malicious conduct;

129. Actual damages and injunctive relief under the Bullard-Plawecki Employee Right to Know Act;

130. Equitable and injunctive relief under federal and state law, including compliance monitoring and corrective action;

131. Pre-judgment and post-judgment interest as allowed by law;

132. Reasonable attorney's fees and costs as provided by statute; and

133. Such other and further relief as the Court deems just and proper.

---

## IX. Jury Demand

134. Plaintiff hereby demands a trial by jury on all issues so triable.

**EXHIBIT INDEX**

- **Exhibit A –** DHS-38 disability verification form submitted August 19, **2024,** with follow-up emails to IT People HR Director Apoorva Ahuja.

- **Exhibit B –** October 24, 2024 email correspondence regarding DHS-38 form.

- **Exhibit C –** January 13, 2025 email correspondence clarifying DHS-38 purpose.

- **Exhibit D –** Letter from Dr. Faber regarding transplant urgency and impact of delayed documentation.

- **Exhibit E –** Corewell Health letter confirming transplant evaluation frozen pending Medicaid insurance verification.

- **Exhibit F –** WhatsApp messages among QA coworkers regarding return labels, sick-time payout, and employment verification.

  **Exhibit F-1, F-2, F-3 –** WhatsApp messages among QA coworkers regarding return labels, sick-time payout, and employment verification.

- **Exhibit G –** June 19, 2025 email from Mercalis HR stating no personnel file exists.

- **Exhibit H –** August 13, 2024 Webex message from Mercalis QA Manager Vicky Thai announcing Plaintiff's removal from the QA team to coworkers.

- **Exhibit I –** Payroll records/pay stubs reflecting time and compensation for August 13, 2024**.**

- **Exhibit J –** Psychiatric/therapy documentation including Lexapro prescription, counseling, and insomnia treatment.

- **Exhibit K –** EEOC Charge No. 471-2025-05243 (IT People Corporation).

- **Exhibit L** – EEOC Charge No. 471-2025-05245 (Mercalis, Inc.).

**Respectfully submitted,**

Date: 9/29/2025

**/s/ Khalid Ali**

Khalid Ali

7420 Woodrow Wilson Street

Detroit, MI 48206

Phone: (248) 991-7244

Email: Khalid7891@mail.com

Plaintiff, Pro Se

CERTIFICATE OF SERVICE I hereby certify that on September 29, 2025, I served the foregoing Second Amended Complaint and all accompanying exhibits by email and CM/ECF on counsel for Defendants at the addresses listed below: Counsel for IT People Corporation and Mercalis, Inc.: Jason B. Brown Matthew T. Wise Page 113 of 114 Gordon Rees Scully Mansukhani LLP 37000 Woodward Ave., Suite 225 Bloomfield Hills, MI 48304 jbrown@grsm.com mwise@grsm.com /s/ Khalid Ali

Khalid Ali